Good afternoon. May it please the court. John Echevarria for the California Attorney General and the Director of the Bureau of Firearms. I'd like to reserve three minutes of my time for rebuttal. All right. I'll try to help you out, but please keep your eye on the clock as well. I appreciate that, Your Honor. Thank you. The Supreme Court has repeatedly told us that certain types of weapons are not entitled to Second Amendment protection and may be banned, including the M-16 rifle and the like. In this case, plaintiffs are challenging eight defined categories of assault weapons that are banned because of the dangers they pose to the public, particularly in mass shootings. Those weapons configurations are defined by certain tactical features and accessories that make those weapons offensive military weapons and not weapons of ordinary self-defense. These restrictions are constitutional under Bruin. At the threshold stage, plaintiffs have failed to show that each of the categories of assault weapon is presumptively protected by the Second Amendment. Okay, counsel, before you get further into the merits of your argument, can I ask, and I'm gonna ask your friend on the other side the same question, what is your view of the relationship between this case and the of this court? Do we think the cases are highly related? They involve very similar evidentiary considerations, the same Bruin standard. The plaintiffs even viewed the cases as related when they filed their notice of related cases at the commencement of this case in the district court to relate this case to Duncan. So do you think, I mean, do you want us, what do you want us to do based on that observation? I mean, should we hold this case pending Duncan or should we, go ahead and, what's your view? So we wouldn't object if this panel wished to hold this case pending resolution of the Duncan en banc proceeding given the similarities between this case and Duncan. But we've also shown, based on the record developed in this case, that California's restrictions on assault weapons are constitutional under the Supreme Court's Bruin standard and also under Heller. But the, there are supervening questions in this case and in Duncan which seem to be extremely similar, i.e. what does common use mean, what does dangerous and unusual mean, in what order do you decide these things, what are relevant historical analogs, which even those the, and some of the statute is even the same with regard to magazines with more than 10 rounds, right? That's correct, Your Honor. So there, these are not just abstractly connected, they are evidentially connected. I think that's right, Your Honor. Some of the definitions in assault weapon relate specifically to magazine capacity for certain rifles and certain pistols. And even more generally, as Your Honor observed, the state is relying on many of the same historical analogs and the same nationwide tradition of weapons regulation in this case and in Duncan. There are substantial material overlaps between the cases. Meanwhile, we have a stay in this case and a stay in Duncan, is that right? That's correct, Your Honor. There's a stay pending appeal in Duncan and an administrative stay in this case at this time. So if I can address the threshold inquiry under Bruin, at the threshold stage, the plaintiffs have not met. Actually, counsel, if I could jump in and interrupt you for a moment before you get to that threshold merits question. In the state's view, is the record fully developed in this case? I appreciate and recognize the fact that the Seventh Circuit case of Bevis was in a different procedural posture because that was a preliminary injunction stage, but at one point in the opinion, the circuit said that there could be some development of the record that would aid in the court's view as to whether an AR-15 is closer to an M-16 or whether it's closer on the other line. You've had multiple opportunities to brief and present evidence to the district court. In the state's view, have you put everything that you've got on the table there? With respect to the threshold inquiry about whether these regulated weapons are self-defense weapons, we do think that we've established a robust evidentiary record showing that these weapons are not weapons of self-defense and that they are like the M-16 and similar weapons that the Supreme Court has indicated may be banned because of their offensive nature and characteristics. So while I appreciate that the Bevis decision in the Seventh Circuit was based on a preliminary injunction posture, the court was also examining a similar body of evidence as the one that we have developed in this case. Right, and that's why I asked that question, because the Bevis court did say that, for example, better data on firing rates may change the analysis and the district court doesn't have to, but it's free to kind of look at that again because of the reloading that's necessary in order to really make both of these weapons work. So I wondered if there was, in the state's view, a similar potential gap in the evidence that the state could fill or whether you've, with the multiple opportunities you've had, have put it all out there and that we're only going to address the merits question here. So the Bevis court did identify some potential areas for further factual development, but it's notable in this case that the plaintiffs have not developed any facts to fill those holes. The plaintiffs have not shown that the evidence at all. They have not shown that the assault weapons being regulated are not like the M-16 or similar weapons and are not offensive military weapons. So the evidentiary record as it exists, the record developed by the parties jointly in this case, is not materially different from the Bevis record. And we think that the record does show that at the threshold stage and the historical stage of the Bruin standard, the assault weapon restrictions are constitutional. So the threshold stage in Bruin is, the court said, when the Second Amendment's plain text covers an individual's conduct, excuse me, the Constitution presumptively covers that conduct, right? And you're saying that you can win at the threshold stage, which I take it means that in your view, the Second Amendment's plain text does not apply to these kinds of weapons. Is that right? So the threshold, that's close, Your Honor. So at the threshold stage, the court does look at the plain text of the Second Amendment, whether the restriction burdens the right of the people to keep and bear bearable arms. But part of that threshold analysis does look at history, namely the original public meaning of the terms in the Second Amendment. So the words in the Second Amendment alone are indeterminate. The court needs to look at the historical context of those words. And common use for self-defense is a limiting principle at that threshold stage. And why is that? Is that because it's part of the definition of what an arm is? Or because it's part of, we're in the, I mean, I take the point that the plain text is not just, you know, is plain text informed by historical understanding of the text. But what, what textual indicia would you point to, to extract the self-defense component of that? Yeah, so the Supreme Court has not identified exactly which term it relates to. I think it relates, as the Bevis Court indicated, it relates to whether an arm is a bearable arm within the scope of the Second Amendment. And on page 32 of Bruin, the Supreme Court observed that no party disputed that the handgun, the weapon at issue in Bruin, was in common use today for self-defense. So the Supreme Court made clear that the common use for self-defense inquiry belongs at the threshold stage. And it likely does relate to whether a weapon is a bearable arm based on the original public meaning. So your position is that this would be, I mean, these kinds of weapons would be outside the original public meaning of what a bearable arm is? That's correct, Your Honor, because these are military weapons. These are not weapons of ordinary self-defense. But when, I mean, when we look at Heller, right, so it starts with, you know, they've got, you know, Dr. Johnson and some of the other 18th Amendment, that, you know, everybody agreed that it at least applied to weapons you would use in militia service. And then the question was, does it also apply to other kinds of weapons? As I read Heller, there wasn't really any question that weapons that would be used by people in the military would count as arms. Was there? So at the founding in 1791, when the Second Amendment was ratified, the Supreme Court observed in Heller that the same weapons that were at home for ordinary purposes like self-defense, those were the same types of weapons that militiamen brought to muster. But over time, because of technological advancement, certain weapons have fallen outside of the scope of the Second Amendment, even if they might be useful in militia service. As the Seventh Circuit stated in Bevis, in Heller, the Supreme Court severed the relationship between the prefatory clause, which is focused on ordinary self-defense. And here, the weapons that are being regulated are not self-defense weapons. And they are, I think it's important also to observe, Your Honor, that the definitions that are being challenged in this case do target specific accessories. These are combat-oriented accessories that exacerbate the lethality of the underlying weapons, like an AR platform rifle, for example, which enable a shooter to fire sustained, rapid, semi-automatic fire, and other features that enable a shooter to conceal their location. And the plaintiffs have... Is it the state's view? I mean, in the state's view, could you prohibit all semi-automatic firearms? I mean, I realize that that would be considerably broader than the statute you have, but would that be permissible? It would be substantially broader than the law we're developing or defending in this case, and the record that we've developed in this case. It would depend on the types of firearms that would be subsumed within that particular type of regulation. I'm not standing here today, I cannot say that the state of California would be able to ban all semi-automatic weapons or all... What is the definition of a semi-automatic weapon? So, a semi-automatic weapon is a weapon that can fire one round for each pull of the trigger. As I understand it from the Duncan case, an ordinary pistol with a magazine does that, for as much as the magazine lasts. It does, Your Honor, but California is not regulating these weapons solely because of their semi-automatic action. It's the fact that... or some larger number of rounds by pulling the trigger each time. So, with a semi-automatic firearm, if I'm understanding the question, Your Honor, and let me know if I'm not, but with each pull of the trigger, a single round is fired, and a select fire or fully automatic weapon... But you don't have to reload the gun, that's the point. You would still have to reload the firearm if... Eventually, but not for each one. That's correct. It depends on the number of rounds in the magazine. There's a lot of material in the record about other characteristics of the A-15s. That's what we're talking about, right? The AR-15 and generic AR platform rifles. Which seem to say that they shoot faster and more aggressively and the kinds of munitions that they shoot are more dangerous and so on. I mean, is that part of the definition or part of the reason for regulating them? Yes, it is. The capabilities that California is regulating, the particular types of accessories and features, don't only enable semi-automatic fire. It's sustained, rapid semi-automatic fire. And if the court looks at the AR platform rifle, for example, the type of ammunition it fires, .223 Remington or .556 NATO rounds, which are designed to tumble and cavitate on impact with a human being... Let me ask you this, counsel. Let's assume that you're right, that in the step one of the Bruin analysis, we do look at the common use for self-defense purposes to inform ourselves of whether this is within the scope of arms that's covered. What in this record do we look at? Surely it can't be just the number of assault weapons owned by Americans at the time, right? Because then that gives rise to that circularity problem. If California hadn't rushed to ban assault weapons, instead of 24.4 million, there might be 50 million out there. So how do we analyze a record in this case, not just this particular record, but in general to figure out where within that line drawing problem we put assault weapons? So on page 622 of the Heller opinion, the court focused on the character of the weapon or the type of weapon being regulated. And later in the opinion, the court discussed the characteristics of the handgun that made the handgun the quintessential self-defense weapon. But the court also contrasted that with M-16 rifles and the like, which the court found to be – the court determined it would be a startling interpretation of the Second Amendment if the operative clause were extended to protect those types of weapons. So the evidence here shows that AR platform rifles, AK platform rifles, and other regulated assault weapon configurations have the same military pedigree, the same combat functionality to enable people – So does it matter that there's 24-plus million assault weapons out there? Does that factor into the analysis in any way? It can be considered. I think the number of weapons can be considered. But I think it's important to note that the Supreme Court never referenced numbers. In Heller or McDonald, the Supreme Court did not count up the number of handguns. And based on the number of handguns that are manufactured, let alone handguns that are owned by individuals, that did not drive the analysis. It was the character of the weapon. Well, because it was self-evident that there were millions and millions of them. But in talking about machine guns – and they – I mean, they really didn't analyze anything. They just said, OK, you can ban machine guns. But you then do get into the circularity. I mean, the assault weapons were federally banned for a while. Yes. I – were these the same definitions, essentially, or – Very similar. The federal definition required two qualifying features. And I gather that since that ban was lifted, the number of machine guns has gone up exponentially. Is that right? For semi-automatic weapons? That's right. The plaintiffs estimate, based on industry estimates, that it's about 24 million or so. No, but I mean, since the federal ban was lifted. Yes, more. The numbers – more or many, many, many more? Yes. Yes? Yes, but the numbers are not dispositive here. Otherwise, it does lead to the circularity. Well, I know that, but it's sort of illustrative of this problem that Judge Nguyen alluded to, which is, do you look at the – your opponents are arguing that the numbers are dispositive, pretty much, as I understand it. Yes. We'll see what they say, but that's my understanding. Yes. And they are arguing that the common-use rubric under Heller and Bruhn means in common use. So it's now, not previously. And so one looks at the current situation and simply says, well, there are just so many of them that they're in common use, and that's the end of the story. But that has varied, actually, over time, depending on whether it was regulated or not, illustrating the circularity. So what would you look to? I mean, how do you decide – you're adding a qualifier, which is it's not in common use, it's in common use for self-defense, and that the fact that many people have them at home is not the answer to the question. So what is the answer to the question? I mean, how do you look at what is – what evidentiary criteria do we use to decide what's in common use for self-defense? Otherwise, I mean, these people apparently have them. What are they doing with them? So that's for the plaintiffs to present evidence on. The plaintiffs have not shown that these types of weapon configurations are the type of weapon that would be for ordinary self-defense. Well, suppose you've got 24 million people to sign a declaration saying, I have it because I think it's good for self-defense. Would that be the answer to the question? No. The court would still need to look at the character of the weapon. But even assuming that these weapons are presumptively protected, at the historical stage, we have developed a robust record of historical analogs and a tradition of firearm regulation that impose the comparable burden on the right to armed defense that were comparably justified, especially under a more nuanced approach, which the Supreme Court in Bruin made clear is required when the state is defending a law that addresses a dramatic technological change from the technologies in place in 1791 or 1868. But now you're moving away from the it's not arms theory. I am. Yes, I am, Your Honor. This is assuming that each of the categories of assault weapons is presumptively protected. And the restrictions we are defending in this case are relevantly similar to the historical tradition that we've identified. I see that I am running into my rebuttal time. Yes, our questions did eat up most of your time, but I'll put your three minutes, three and a half minutes. I'll put that back on the clock. I appreciate that, Your Honor. Thank you so much. Afternoon, Your Honors. May it please the Court. Pete Patterson for the Appellees. Under Heller and Bruin, this is a straightforward case. Those cases establish that law-abiding Americans have an absolute right to own firearms that are in common use for lawful purposes. Isn't that just irretrievably circular? If there were an assault weapon ban still in, a federal assault weapon ban, presumably the numbers of these weapons that were kept by individuals would be way less. Two answers to that, Your Honor. The first answer is that the allegation of circularity was given in the dissenting opinion in Heller. And nevertheless, the Supreme Court said that the test is in common use. Second, it is not circular because with a representative government in this country, presumably, an item that a substantial portion of the population believes is effective for lawful purposes, a ban of that item is not going to be able to be maintained for long periods of time across broad swaths of the country. And that's what we see here. These firearms have not traditionally been illegal in this country as the Supreme Court itself held in the Staples case. Well, they haven't traditionally existed. As I understand it, they basically were created during World War II. Is that not true? These specific firearms in the 1950s and 1960s is when they were developed. But this particular firearm, they're semi-automatic firearms like other semi-automatic firearms. And the Supreme Court in the Staples case said that these have traditionally been regarded as lawful possessions, unlike machine guns. Take cigarettes, okay? Cigarettes were ubiquitous in this country for many, many years. And they were then discovered to be dangerous. And they were banned. And now they're hard to find. So it takes a while till people understand the danger of something sometimes. And then they're banned, and it becomes a fait accompli that they weren't banned earlier is really what you're arguing. Well, it does not always take a long time. Take machine guns. Those came on the market at a similar time as semi-automatic firearms. They did not sell to the general public because they have uniquely dangerous portentities, as this court said, in Teter. And notably, the reason that machine guns are dangerous is because they can't be controlled. And what's ironic is that California is banning features here that enhance the control of a firearm. So it's actually backwards. The firearms that are left after California's ban are more dangerous because they're harder to shoot accurately. But machine guns were very quickly regulated comprehensively in the state, first at the state level and then at the federal level. And if you look at it, machine guns came on the market in the 1920s. They were not actually banned at the federal level until the 1980s. Over that 60-year period, according to federal registration statistics, there were approximately 176,000 machine guns that were purchased. That is basically every single month now in this country how many AR-15s and similar rifles are purchased. So the distinction between those firearms and these firearms is their commonality for a lawful purpose. Let's take your argument because you're relying very, very heavily on just the numbers. As I understand it, of the 24-plus million assault weapons that are out there, owned by under 8 million people, right, out of the population of 330-something million people. So setting aside the circularity problem, I think if you dig down to the numbers, it creates a problem for you as well, setting aside the circularity. So what numbers are we talking about? Are we relying on national numbers? This is a California statute. Do we then look at only the number of assault weapons in California and focus more on the local jurisdictions, which is something that the Supreme Court acknowledged? There are a lot of problems that are looked at at a local level, right? So if you only identify the numbers of assault weapons in California, that's a substantially smaller number. And then do we then carve out assault weapons owned by law enforcement, which are then exempt? I don't even know, if it's in the record, how many that would be. So can you address those problems with your 24.4 million assault weapons that's out there? Yes, and we're not relying solely on numbers. So our position is that it's the state's burden to show that these are dangerous and unusual firearms. And as this court said in Teeter, that means it's a state burden to show both that they have uniquely dangerous propensities and that they are not typically possessed by law-abiding citizens for lawful purposes. And so if there are millions of an item, that means that the state is simply not going to be able to show. It's a sufficient but not necessary condition. The state is not going to be able to show that these are not typically possessed by law-abiding citizens or that they're highly unusual in society at large. Let me set aside the burden issue for now because I don't want you to finish your argument without tackling some of the issues with the numbers that I'm concerned about. On this record, which is why I started off asking counsel and I'll ask you the same question, whether the record has been fully developed here. We're trying to figure out whether an AR-15 is functionally equivalent to an M-16 and should. We're not without guidance, right? We know that even a bearable nuclear weapon is not going to be protected by the Second Amendment. We've got guidance on the M-16. Now we're trying to figure out where assault weapons really fall within that spectrum. And so you're saying, well, 24.4 million, that seems like an awfully big number, but we only look at California because it's been regulated for several decades. Now you're talking about a few hundred thousand assault weapons. Then if you carve out law enforcement, then it's a lot smaller than that. And that's, I think, where your argument on how commonly used for self-defense it is, especially if we go to the local level, starts to fall apart. So what would your response be to that? First of all, in terms of the scope, this is a national inquiry. Heller talked about the most commonly used firearms for self-defense nationwide. It didn't look in D.C. where they had been banned since 1972 to see if they were in common use in D.C. So it's a nationwide question. Do the people of this nation commonly possess this firearm for lawful purposes? It's not just self-defense. It's for any lawful purposes. And what other justices have done? Justice Brett Kavanaugh, when he was on the D.C. Circuit, looked at the record with respect to AR-15s. At that time there were 1.6 million, and he said that was in common use, as did the majority of the D.C. Circuit at that time. Justice Thomas, in his Freedman dissent from denial of cert, said that 5 million was in common use. So we are well beyond these figures. That is anywhere close to the line of not being in common use. And in terms of this record, as to what this record shows, Plaintiffs' Exhibit 4-4 is a survey of owners of some of these types of weapons, and what it shows is that 11 percent of them are law enforcement, and out of those, half of them are retired. So even that 5 percent, it doesn't show that they use them for law enforcement purposes. It just says that they have law enforcement experience. We have survey data that the district court cited from the Washington Post showing that 16 million Americans own these firearms. The Bill English survey data that is cited by the district court shows that 24 million Americans own these firearms, and both of those surveys ask people why they own these firearms. In the Bill English data, over 60 percent said they own them for self-defense. In the Washington Post, 65 percent said they primarily own them for self-defense, and 26 percent, in addition, said they secondarily own them for self-defense. So that's over 90 percent for self-defense. So this record is very strong in showing that these are firearms that people use for lawful purposes broadly across this country, and they are indeed the most popular rifles in the history of this nation. And so the notion that the most popular rifles in the history of this nation could be deemed dangerous and unusual is just implausible. And the arguments that are being made here are basically the reverse of the arguments that were being made in Heller. In fact, at pages 54 to 55 of D.C.'s brief in Heller, they cited an article from Guns.com that said some people prefer long guns for self-defense to handguns, and Justice Breyer cited this part of the brief in his dissent. And if you look at that Guns.com article, what it says is that handguns are not good self-defense weapons, but instead rifles are better. And there's a picture of a semi-automatic rifle with a pistol grip, and that the plaintiffs in D.C. were saying this was the alternative that people have to defend them. Not the plaintiffs, the District of Columbia was saying that this is the alternative that people can have to defend themselves. There was evidence there at the Violence Policy Center put before the Supreme Court to say that these are the preferred handguns or the preferred weapons for mass shooters, and they're by far the most preferred firearm for criminals to use in this nation. But the Supreme Court rejected all of that. In this case, essentially taking the very same arguments that were made against handguns in Heller and repackaging them to be made against assault weapons. And those arguments did not prevail there, and they can't prevail here. And what's interesting is the opposing counsel mentions mass shootings, which of course are deplorable, awful events. But their expert, Clarivas, had an increasingly gerrymandered definition to try to get to certain shootings where AR-15s are used in those, and he identified 16 shootings from 2012 to 2022, and he said 75% of those involved an assault weapon. And again, those are tragic incidents, deplorable incidents, but if you add up the number of deaths in those incidents, it's 300 and something. Every single year in this country, 6,000 to 7,000 people are murdered with handguns. So that's every month more people are murdered with handguns than were in the entire decade of those shootings cited by the opposing side's experts. That's not to say that this is not a problem, but it's just to say if that did not suffice in Heller, similar type of evidence can't possibly suffice here. I was just going to ask you to address Duncan. Yes. You told the district court that the cases involved substantially the same facts and questions of law. Why should we resolve any of this when the en banc panel is going to hear Duncan in two months? We told the district court that at a time when this case only addressed the magazine component. It's now been expanded, so it's less related to Duncan than it was then. And there are distinct questions with respect to magazines and firearms. But we acknowledge they are related cases. But this is a fundamental right. As this court said in Baird v. Bonta, delay is typically not countenance in fundamental rights. And in addition, usually percolation is a good thing on an issue when a court that is a superior court, as the en banc court is to a panel, is considering an issue. It's normally considered a good thing to have other jurists' views on an issue. So we think it would be beneficial to the en banc court to have this panel's views on the issues that are before the court. Well, I mean, I suppose that depends what the views would be. But your first point about the delay, I mean, that sort of goes to whether there should be a stay or whether the stay should be maintained in place. And on that question, we'd have to look at your likelihood of success on the merits. And we have a published order from the Duncan en banc panel saying that the state is likely to prevail on the merits in that case. So if we sort of take that as a given, as we have to, if the state is likely to prevail in Duncan, how can you be likely to prevail here? How can you win here if the state wins Duncan? Well, that's my understanding is that's a preliminary determination of likelihood. As to the stay, as to the stay question. Yes. In other words, I understand Judge Miller is saying how could you prevail as to the stay, not as to the merits, merits. Well, I believe if we were to prevail, and my point of delay was not with respect to the stay, but just with respect to getting to a determination in the case, which if this case is put on hold for the en banc court to make its decision is going to engender some delay. But even with respect to the stay, if this court determines that not just is there a likelihood that we succeed in this case, but actually that we do succeed in this case and that we prevail, then I believe with that determination of a panel of this court, it would not be inconsistent to dissolve the stay in this case, particularly since it is distinct issues. But how distinct are they really? I mean like I looked at the briefs in Duncan and it's all the many of the same questions about the common use for self-defense. Does that go at prong one or at prong two? If it's at prong two, like how much specificity do we look at in assessing the historical examples that they offer basically the same historical examples? So I guess let me repeat the question I asked earlier because I'm still not sure I understood the answer, which is if the state does in fact win in Duncan, doesn't that make it overwhelmingly likely that they're going to win here? I think it does make it likely. The one distinct issue is that there could be a distinction between well is a magazine an arm and are these items here, which are firearms, are those arms? So there could be a distinction there. We would submit that it would both be analyzed the same way, but the state has argued otherwise that the fact that a magazine is not a firearm is a distinction that could have significance. So that's one way that the cases could come out different. But other than that, Your Honor. From the earlier, I was on the panel and in the earlier hearing, I don't think that distinction was given any weight at all, as I recall. Well, I personally don't give that argument much weight either, Your Honor, but it is an argument that is being made and that is one possibility for a distinction. At a minimum, we'd have better guidance on what the analytical framework should look like. Well, our view is that this is laid down very clearly in Heller and in Bruin. First, that at the plain text level, Heller explicitly says that the founding dictionary said all firearms are arms. So these are firearms, the plain text level, that should be. As I understand it, and correct me if I'm wrong, the AR-15 is in every respect the same as an M-16, except for the M-16's ability to fire in automatic mode, right? So the same operating system, same ammunition, same core design. Am I correct in that understanding? I mean, there are different ways these things can be configured, but yes, basically, yes. But I'll explain why. In all material ways, they're exactly identical. I'll explain why all material ways except the constitutionally dispositive way. And that's because Heller said that M-16. And that constitutionally dispositive way is the ability to fire in automatic mode? No. That constitutionally dispositive way is that Heller said M-16s and the like can be banned because they're highly unusual in society at large. And AR-15s are ubiquitous in society at large. And there may be reasons for that. So if the M-16 manufacturer chooses to lock the mode so that you can't basically put the gun in automatic firing mode, could that be sold commercially, even if you can aftermarket buy like a key to unlock that? Yes, the aftermarket key could be made illegal to turn it into a machine gun. But if it's a semi-automatic M-16, then no, that could not be banned. Staples has said semi-automatics, unlike machine guns, traditionally have been regarded as lawful possessions in this country. And in terms of the – Stapleton was not a Second Amendment case. It wasn't a Second Amendment case, but when we look to history and tradition and the Supreme Court has said that semi-automatic AR-15s, that was a specific firearm at issue in this case, traditionally has been regarded as lawful possession, unlike machine guns. That speaks directly to the question at issue. But in terms of the functionality of these firearms, what the military manuals say in this case that are in this record is that the reason why you should rarely fire in automatic mode is because it's hard to control. And so it's hard to fire accurately. And that is unlike in semi-automatic mode. So that is a key – And that's why the advice – the military, although the weapon that they use can shoot in automatic mode, they don't use it that way. Yes, except for uniquely military applications when they need suppressive fire, particularly – But in general, in their military applications, they don't use it that way. Yes, because the military, just as law-abiding citizens, want to fire accurately. And what's interesting, as I said, these features – I'm sorry. I didn't understand that last sentence. Both the military and law-abiding citizens in defense purposes want to fire accurately. But as to the – So that is why – This is a military weapon if you think that matters. And I gather you don't. But if we thought that – Well, Heller said the reason they could be banned is not because they have military application, but despite the fact that they have military application because there was a dispute going back to the Miller case, interpretation of the Miller case, which said that sawed-off shotguns can be banned because they are not part of ordinary military equipment or usable for common defense. And so that's what the Supreme Court reacted and said, well, that's the startling conclusion. If you read that to say that something has to be in ordinary military use in order to be protected, then M-16s would be protected. But the Supreme Court said you have to read further in Miller and say that Miller also said that people at the founding brought their commonly-owned firearms with them to militia service, so you have to read those statements together. And the Supreme Court extracted the common-use principles, so the competing principles – But it was common use for self-defense. It was common use for lawful purposes. And the competing principles that the Supreme Court was considering were – It doesn't have to be for self-defense.  No, it has to be for lawful purposes. Because they like to look at them. They think they're attractive. It could be for hunting. It could be for target shooting. Remember, the reason this is in here – Not protected by the Second Amendment as such? Absolutely, because the reason the Second Amendment is in there is for militia purposes, and the military wants people training with firearms so that they're expert in firearms. That's likely the reason we won the revolution is because of our marksmanship. The notion that training would not be protected is wholly implausible. But the Supreme Court was choosing between two competing definitions – for lawful purposes, commonly possessed, or useful in the military. And under either of those definitions, we win this case. Because everybody agrees these are – these can be used for common defense purposes and would be good militia firearms. And they're also in common use for lawful purposes. And I see that my time has expired. All right. Thank you very much for your argument, counsel. Thank you. I'd like to address just a few points, if I may. Regarding the dangerous and unusual tradition that the plaintiffs referred to that was discussed in Teeter – notably, Teeter could not overrule this Court's previous decision in U.S. v. Alanis that plainly placed the common use for self-defense inquiry at the threshold stage. And we have shown that these weapons do not have the character of self-defense weapons. And the reason this matters is because the burden is different, depending which one they're on. I think the burden is important. But we've also presented evidence showing that these are military weapons. But otherwise, it doesn't make any practical difference which – I think that's right. The only reason it makes a difference is if it shifts the burden. I think that's generally right. We are willing to defend these restrictions at either stage of the Berman analysis. But I do want to note that the – I'm still having difficulty understanding when you say that these are not – what criteria do we use to decide that these are not in common use for self-defense? So the Supreme Court – I understand your opponent disputes that definition. He says it has to be for any lawful purpose. But let's assume it does have to be for self-defense. How do we – is it a judicial determination based on the character of the weapon or what? I think that's right, Your Honor. The Supreme Court has instructed the courts and litigants to look at the character of the weapon to determine whether the character of the weapon makes it a self-defense weapon, not for any potential self-defense use, but for use in ordinary, typical self-defense situations. And I want to note that the dangerous and unusual – Exactly why this doesn't fit that criteria. Because the capability of these weapons to engage in sustained rapid semiautomatic fire, which is a combat technique, according to the record, the plaintiffs have not explained how rapid, sustained semiautomatic fire to shoot as many rounds in a shorter period of time to hit as many targets as possible, why that would be characteristics that would make these weapons self-defense weapons. I know that in the Duncan record there was at least some material about how often in a self-defense situation people actually fire a certain number of times. And that evidence is here as well. So the evidence shows that generally individuals rarely fire more than 10 rounds in a given period of time in a self-defense situation. Isn't that just the sort of – I don't want to say never, but the record shows that on average it's about two rounds in self-defense, and the vast majority involves just the mere brandishment. But that seems like it would be relevant if we were sort of balancing the interest in self-defense against the very substantial public safety interest. But I read Bruin as telling us not to do that sort of interest balancing, and it seems like you're taking the interest balancing that Bruin told us not to do and sort of reimporting it under the rubric of determining whether this is an arm that's in common use for self-defense. So I do see that my time is up, and if I may address it. Go to the question. Thank you, Your Honor. We are not asking this court to engage in interest balancing. We're not asking the court to weigh the fit between the assault weapon restrictions and the compelling government interest here. But we are asking the court to look at the character of the weapon in assessing the burden on the right-to-arm defense, which the Supreme Court explained in Bruin is one of the variables that the court looks at in comparing the modern regulation to the historic traditions. And we're also asking the court to look at the present-day justification for the assault weapon restrictions, which the Supreme Court has also identified as a relevant consideration. Well, during the kind of interest balancing that was happening before, does talk about the how and why of the historical examples and how they compare. So there is something like interest balancing going on in the Bruin analysis, it appears. In other words, they want to know what is the purpose of the restriction and how it's analogous to historical examples of regulation of similar weapons, or not even similar weapons, of weapons. That's right, Your Honor. The present-day burden on the right-to-arm defense and the justifications for the modern law, those are relevant considerations, but the Supreme Court has directed the inquiry not to comparing those today, but to comparing those variables to historical regulations. And we have shown that there are relevantly similar historic traditions that we are relying on here that show that the right-to-arm defense is not destroyed, like in Heller and Bruin, where the restriction was extremely onerous because of the type of restriction in restricting the quintessential self-defense weapon and in addressing a societal problem that existed at the founding and during Reconstruction. Here, under a more nuanced approach especially, we have shown that California's restrictions are historically justified, even assuming that the regulated assault weapons, each category, is presumptively protected, which they are not. Unless the Court has any additional questions, we would ask the Court to reverse, but again, we would not object if the Court were to hold this case, preserving the status quo, while the Duncan en banc proceeding is completed. All right. Thank you very much, Counsel, to both sides for your very helpful arguments today. The matter is submitted, and we'll issue a decision in due course. All rise. This Court for this session stands adjourned.
judges: BERZON, NGUYEN, MILLER